UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEECO LLC, ZAHNER DESIGN GROUP, LTD., HOOKLESS SYSTEMS OF NORTH AMERICA, INC., KEECO, INC., HOLLANDER PARENT CORPORATION, SURE FIT HOME DÉCOR HOLDINGS LLC, SF HOME DÉCOR, LLC, SURE FIT HOME PRODUCTS, LLC, SURE FIT HOME DÉCOR HOLDINGS CORP, SURE FIT HOME DÉCOR LLC, and FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, | Civil Action No.: <br><br> 1:23-cv-02003 (PAE) |
| Plaintiffs, | |
| v. | |
| KARTRI SALES COMPANY, INC., | |
| Defendant. | |

**FIRST AMENDED COMPLAINT**

Plaintiffs Keeco LLC, Zahner Design Group, Ltd., Hookless Systems of North America, Inc., Keeco, Inc., Hollander Parent Corporation, Sure Fit Home Décor Holdings LLC., SF Home Décor, LLC, Sure Fit Home Products, LLC, Sure Fit Home Décor Holdings Corp., Sure Fit Home Décor LLC, and Focus Products Group International, LLC (collectively "Plaintiffs"), by their attorneys, hereby complain of Defendant Kartri Sales Company, Inc. ("Kartri"), as set forth below.

## JURISDICTION AND VENUE

1.      This is an action for trademark infringement and unfair competition under federal law and the laws of the State of New York.  This Court has jurisdiction over the federal claims of this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1338.

2.      The Court also has jurisdiction under 28 U.S.C. §1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

3.      The Court also has jurisdiction over the state claims under 28 U.S.C. §1338(b), and pursuant to its supplemental jurisdiction under 28 U.S.C. §1367.  The state claims asserted herein are so related to the federal claims as to form part of the same case or controversy.

4.      This action arises from Kartri's manufacture, use, importation, offer for sale, and/or sales of products that infringe Plaintiffs' trademark rights, including Plaintiffs' Trade Dress.

5.      This action is related to 1:15-cv-10154 (PAE) previously filed within this district (which was consolidated with Civil Action No. 1:15-cv-05108 (PAE)).  That prior case being referred to herein as "*Focus v. Kartri*" or "*Kartri I*."

6.      Attached as Exhibit 4 is a copy of the Court's Opinion and Order of December 22, 2022 in *Kartri I* (Dkt. 501, "Opinion and Order") which is fully incorporated herein by reference.

7.      This Court has personal jurisdiction over Kartri in that Kartri has engaged in acts constituting doing business in the State of New York, including in this judicial district, and have intentionally directed its tortious activities toward the State of New York, including this judicial district.  Kartri has committed acts of intellectual property infringement in New York, including this judicial district, and has delivered the accused products into the stream of commerce with the expectation that they will be purchased and used by consumers in the State of New York, including this judicial district.  Kartri

has sold or offered for sale products, including products that are the subject of this Complaint, to consumers in the State of New York, including this judicial district.  In addition, Kartri has been in constant and willful violation, and is currently in violation, of an injunction issued in *Kartri I* by a Court of the Southern District of New York.

8.      The Court also has personal jurisdiction due to the fact that Kartri consented to jurisdiction here, and also waived or forfeited objections thereto, in *Kartri I*, and the present action involves the same Trade Dress rights as in that action.

9.      Venue is proper in this district in that Kartri is a corporation subject to personal jurisdiction within this judicial district, and deemed to reside in this district, pursuant to 28 U.S.C. §§1391(b) - (d), and in that Kartri has committed acts of infringement in this district.

## **THE PARTIES**

### *ZDG and HSNA*

10.      Plaintiff Zahner Design Group, Ltd. ("ZDG") is a corporation of the State of New York having a principal place of business at 179 Christopher Street, New York, New York 10014.

11.      ZDG is the owner of the Intellectual Property Rights, including the Trade Dress rights, that are the subject of this First Amended Complaint.

12.      Plaintiff Hookless Systems of North America, Inc. ("HSNA") is a corporation of the State of New York having a principal place of business at 179 Christopher Street, New York, NY 10014.

13.      HSNA is the exclusive licensee of ZDG for all of ZDG's Intellectual Property Rights ("Intellectual Property Rights").

14.     As part of HSNA's exclusive license, HSNA has the right to grant further licenses or sub-licenses to those Intellectual Property Rights.

*Focus Products Group*

15.     Focus Products Group International, LLC ("Focus") was the prior name of a corporation of the State of Illinois having a principal place of business at 300 Knightsbridge Parkway, Suite 500, Lincolnshire, IL 60069.

16.     Focus owned an exclusive license from HSNA to all of the Intellectual Property Rights of ZDG relating to shower curtains.

17.     In particular, Focus was the successor-in-interest to rights which HSNA had exclusively licensed to Arcs and Angles, Inc. and Arcs and Angles, LLC (collectively "Arcs and Angles").

*The Sure Fit Entities*

18.     On March 6, 2017, Focus underwent a corporate name change to Sure Fit Home Décor, LLC. (referred to herein as "Plaintiff Sure Fit Home Décor, LLC.")

19.     On July 13, 2017, Plaintiff Sure Fit Home Décor LLC (formerly known as Focus) sold its license in the Intellectual Property Rights to Plaintiff SF Home Décor LLC.

20.     Plaintiff SF Home Décor, LLC ("SF Home Décor") is a Delaware Limited Liability Company having a principal place of business at 8000 Quarry Road, Alburtis, Pennsylvania 18011.

21.     Via the July 13, 2017 transaction, Plaintiff SF Home Décor LLC became the successor-in-interest to the rights previously held by Focus.  In other words, Plaintiff SF Home Décor LLC became the exclusive licensee of HSNA of the Intellectual Property

Rights relating to shower curtains (including, but not limited to, for sales in hospitality and retail channels).

22.     Plaintiff Sure Fit Home Décor Holdings Corp. was a Delaware corporation having a principal place of business at 60 E. 42nd Street, Suite 1250, New York, New York 10165.

23.     Plaintiff Sure Fit Home Décor Holdings LLC is a Delaware corporation having a principal place of business at 60 E. 42nd Street, Suite 1250, New York, New York 10165.

24.     Plaintiff Sure Fit Home Décor Holdings LLC is the successor-in-interest to Plaintiff Sure Fit Home Décor Holdings Corp.

25.     Plaintiff Sure Fit Home Products, LLC ("Sure Fit Home Products") is a Delaware Limited Liability Company having a principal place of business at 8000 Quarry Road, Alburtis, Pennsylvania 18011.

26.     Sure Fit Home Décor Holdings, LLC, SF Home Décor, LLC, and Sure Fit Home Products, LLC  are collectively referred to herein as "Sure Fit."

27.     In terms of the current corporate structure of the Sure Fit entities:

(1) Sure Fit Home Décor Holdings LLC is a parent of SF Home Décor LLC; and,

(2) SF Home Décor LLC is a parent of Sure Fit Home Products, LLC.

*Hollander*

28.     Hollander Parent Corporation ("Hollander") is a Delaware corporation located at 60 E. 42nd Street, Suite 1250, New York, New York 10165.

29.     By way of a transaction in or about April 2021, Hollander became a parent of Sure Fit Home Décor Holdings LLC.

*The Keeco Entities*

30.     Plaintiff Keeco, Inc. is a Delaware corporation located at 390 Fifth Avenue, 2nd Floor, New York, New York 10018.

31.     By way of a transaction in or about September 2022, Keeco, Inc. became a parent of Hollander.

32.     Plaintiff Keeco LLC is a California limited liability company located at 390 Fifth Avenue, 2nd Floor, New York, New York 10018.

33.     By way of a transaction in or about September 2022, Keeco, LLC became a sister company to Sure Fit Home Décor Holdings LLC.

34.     As discussed below, Plaintiffs have suffered damages, including for example, damages associated with lost sales, lost profits, and lost licensing revenue, directly caused by the willful and bad faith actions of Kartri's infringement.  Moreover, the reputations and goodwill that Plaintiffs have developed at great effort for themselves, their intellectual property rights, and their products, have suffered by Kartri's sales of inferior and infringing products in the market.  Plaintiffs have each suffered wrongful injury caused by Kartri, and each have standing to assert the present claims and to seek the requested relief (including, for example, enforcement of the Court's prior injunction), to redress such injury.

*Third-Party Carnation*

35.     Third party Carnation Home Fashions, Inc. is a New York corporation with offices at 53 Jeanne Drive, Newburgh, New York 12550 ("Carnation").

36.     Carnation entered into a Licensing Agreement dated February 1, 2012 relating to the Intellectual Property Rights in suit ("Carnation Agreement"), in which ZDG, HSNA, and Arcs and Angles LLC granted Carnation a sublicense to certain of ZDG's Intellectual Property Rights that were exclusively licensed by ZDG to HSNA, and exclusively licensed by HSNA to Arcs and Angles LLC.

37.     The Carnation Agreement was later transferred by Arcs and Angles LLC to its successor-in-interest Focus, and then later transferred from Focus to its successor-in-interest Sure Fit.

38.     Carnation, ZDG, HSNA, and Sure Fit amended the Carnation Agreement on September 29, 2021 ("Carnation Amendment").

39.     As part of the original Carnation Agreement, and as confirmed in the Carnation Amendment, all Intellectual Property Rights of Carnation to certain ring and shower curtain products sold by Carnation, including, but not limited to, all trade dress rights, and all rights to the mark EZ ON used with that ring, were owned and to be owned by ZDG (with ZDG licensing to its licensees and sub-licensees, as per those parties' agreements), and Carnation's use and commercialization of those rings and shower curtains, and all intellectual property relating thereto, including, but not limited to, all trademark and trade dress rights associated therewith, would inure to the benefit of ZDG and its sub-licensees and their successors-in-interest.

40.     An assignment of those rights was further recorded in the U.S. Patent and Trademark Office on October 1, 2021.

### *Defendant Kartri*

41.     Defendant Kartri Sales Company, Inc. (defined above as "Kartri") is a

7

corporation organized and existing under the laws of the State of Pennsylvania having a principal place of business at 100 Delaware Street PO Box 126, Forest City, PA 18421. Kartri makes, sells, and distributes shower curtains for sale in the United States, including the accused products.

42.     Kartri is a defendant in two actions in this district which were consolidated under docket number 1:15-cv-10154 (PAE) (defined above as the "*Focus v. Kartri case*" or "*Kartri I*").

43.     In *Kartri I*, it was adjudicated, *inter alia*, that Plaintiffs ZDG, HSNA, and Sure Fit have valid and enforceable Trade Dress rights, and that Kartri willfully infringed those rights.

## FACTS

### KARTRI'S CONTINUED BAD FAITH INFRINGEMENT

#### *Kartri's Ongoing Infringements*

44.     In *Kartri I*, the Court ruled that Kartri infringed Plaintiffs' Trade Dress via Kartri's sales of its "Ezy Hang" products.

45.     In addition to the "Ezy Hang" products, Kartri has sold and continues to sell, further products that are intended to copy, imitate, or mimic, Plaintiffs' Trade Dress.

46.     Plaintiffs learned after the close of discovery (but before trial) in *Kartri I* that Kartri had introduced further products after the close of discovery.

47.     In particular, Kartri introduced a new product which it has called its "Hang2it" or "teardrop" product.

48.     Some images of the "Hang2it" product are shown in Exhibit 1.  These include images from Kartri's website filed by Kartri in this case at Dkt. 14-2.

49.     Kartri has also offered for sale, and, upon information and belief, sold, flat-topped versions of the "Hang2it" product.

50.     An image of one of the flat-topped "Hang2it" products is provided in Exhibit 2.

51.     Kartri's Hang2it products shown in Exhibit 1 and Exhibit 2 are referred to herein as the "accused products."

52.     Before trial in *Kartri I*, Plaintiffs reserved all rights to pursue Plaintiffs' claims that Kartri's further products infringe Plaintiffs' rights.

53.     After trial, the parties submitted letter briefing regarding whether Plaintiffs could proceed with claims regarding the Hang2it products, whether as part of *Kartri I* in or in a new action.

54.     The Court ruled that "Focus … has not waived its right to challenge Hang2it, whether as a violation of the Court's post-trial injunction, as Focus proposes, or on other grounds.  As Focus recounts, Hang2it, having been introduced long after the outset of this case, was not a subject of discovery, and therefore was not properly within the scope of the trial.  Dkt. 519 at 1-2 (citations omitted).  That ruling does not prohibit Focus from contending either that Kartri, effective upon the issuance of the Court's post-trial injunction, has violated that injunction by marketing Hang2it, or that Kartri's actions in connection with Hang2it at any time – whether before, during or after trial – have violated Focus's rights."  *Kartri I*, Dkt. 529 at 1-2.

55.     The Court also ruled that "it is prudent and right that Focus pursue its challenge to Hang2it in a separate action."  *Id.* at 2.

56.     As a result, Plaintiffs filed the present action further to the Court's ruling.

*Plaintiffs' Trade Dress Rights*

57.    Plaintiffs own valuable trademark rights to their products.

58.    Those rights include Trade Dress rights to the shower curtain products sold and licensed by Plaintiffs, including Keeco's predecessors-in-interest.

59.    Plaintiffs' Trade Dress rights are to the visual appearance of their shower curtain products, which provide the visual appearance of:

  a.  a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;

  b.  and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;

  c.  wherein each ring includes a slit or gap in the ring;

  d.  and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

60.    The combination and arrangement of the design elements set forth above constitute the Trade Dress owned by Plaintiffs.

61.     Examples of Plaintiffs' Trade Dress were provided during discovery and at trial in *Kartri I*.

62.     These included, but were not limited to, examples of Plaintiffs' "horizontal slit" products, i.e., those versions of Plaintiffs' Trade Dress including a horizontal slit between pairs of rings in the shower curtain.

63.     In *Kartri I*, Kartri had a full and fair opportunity to defend against Plaintiffs' claims.

64.     Kartri had the opportunity to assert any defenses that Plaintiffs' Trade Dress rights are:  allegedly unenforceable; and/or allegedly barred by other products in "the public domain"; and/or allegedly barred because of patent considerations; and/or any other alleged defenses.

65.     In *Kartri I*, Kartri's defenses were rejected.

66.     Kartri may not now retry issues that were previously adjudicated in over seven and a half years of litigation and six days of trial.

67.     Kartri may not now assert defenses or arguments that were rejected in *Kartri I* (as meritless or as waived), or that were not asserted.

68.     The Court's adjudications in *Kartri I* are all binding upon Kartri in this case under established preclusion principles such as collateral estoppel (also known as issue preclusion).

69.     This includes the Court's adjudications regarding the validity and enforceability of Plaintiffs' Trade Dress, such as:  the specificity of Plaintiffs' Trade Dress; its non-functionality; its secondary meaning; its non-genericism; and the Court's

adjudications of certain factors relating to likelihood of confusion that similarly apply in the present action.

### *Kartri's "Hang2it" Products Violate the Court's Injunction*

70.     In *Kartri I*, the Court issued an injunction which "enjoins defendants from further infringement or unfair competition with the EZ-ON Mark and Trade Dress, and Kartri from further infringement or unfair competition with the HOOKLESS® Mark. Such conduct includes, but is not limited to, manufacturing, selling, advertising, or in any way commercializing the Ezy Hang product. Defendants are also enjoined from branding or advertising their products in any way that suggests an affiliation with the EZ-ON or HOOKLESS® Marks or Trade Dress." Exhibit 4 at 167.

71.     As ruled by the Court, Kartri was enjoined from any further infringement of, or unfair competition with, the Trade Dress, which injunction was not limited to the Ezy Hang product.

72.     The accused "tear drop" Hang2it product of Exhibit 1 falls directly within the scope of the Trade Dress upheld in *Kartri I*.

73.     It meets every element of the Trade Dress (*see,* Exhibit 4), as shown in Exhibit 1.

74.     Kartri and its counsel were confronted with this issue in correspondence (*see e.g.,* Exhibit 3), and then a filing in this Court (*see e.g., Kartri I*, Dkt. 519 at 2-3).

75.     Kartri and its counsel have never rebutted, in correspondence or court filings (*see e.g., Kartri I*, Dkt. 521 at 2), that the accused product of Exhibit 1 meets every element of the Trade Dress.

76. Nonetheless, Kartri continued to offer for sale and sell its Hang2 products (namely, its "tear drop" product at a minimum), after the December 22, 2022 date of the Court's injunction.

77. Furthermore, Kartri still continues to sell its Hang2it products as of today's date, in deliberate disregard of the Court's injunction.

78. Plaintiffs seek enforcement of the injunction against Kartri's ongoing violations thereof, and that a ruling of civil contempt be issued against Kartri for its ongoing brazen bad faith, as further discussed below.

79. Plaintiffs request that Kartri be enjoined from further violation of the Court's injunction, and be subjected to penalties and payment of damages for its violations after issuance of the injunction and forward, in addition to any damages for sales before the date of the injunction.

### *Kartri is Also Subject to Damages for Pre-Injunction Sales*

80. As set forth above, Kartri's sales of accused products after December 22, 2023 violate this Court's injunction.

81. In addition, Kartri's sales violated Plaintiffs' rights before the injunction was entered, giving rise to liability for damages for those pre-injunction sales.

82. Kartri began its infringement of Plaintiffs' Trade Dress in 2013, which is when Kartri first began its offering for sale its infringing Ezy Hang products.

83. Plaintiffs' Trade Dress was valid and enforceable when Kartri's infringement began.

84. Kartri's further infringements do not change the date when Kartri's infringement began.

85.     In fact, the issue of further or later infringements was present in *Kartri I*.

86.     In *Karti I*, the Court ruled that the determination as to the distinctiveness of the Trade Dress must be made as of the date of the alleged infringement.  Exhibit 4 at 62.

87.     In *Kartri I*, Kartri had initially introduced an accused infringement containing slits in the same orientation.  *See e.g.*, Exhibit 4 at 11.

88.     Kartri later introduced a second, accused version of its infringement, containing slits in a "mirrored" orientation.  *Id.* at 12.

89.     Kartri took the position that only one assessment was needed of Plaintiffs' Trade Dress rights.

90.     Kartri never asserted that its further infringement required any different assessment as to Plaintiffs' Trade Dress rights or as to when Kartri's infringement "began."

91.     Kartri recognized that its two accused infringements, introduced at different times, required one analysis as to Plaintiffs' Trade Dress rights, not two.

92.     Kartri waived any argument that when its infringement began must be calculated separately for each further infringement, as opposed to when Kartri actually first began infringing.

93.     In *Kartri I*, Kartri had a full and fair opportunity to argue the issue that each further infringement allegedly "changed" when its "infringement began," but raised no such argument.

94.     As such, Kartri waived this argument in *Kartri I.*

95.     Likewise, having already litigated this issue, Kartri is estopped by *Kartri I* from now relitigating this issue, or shifting its position as to its continuing infringements.

96.     Moreover, Plaintiffs' Trade Dress is and has been valid and enforceable when Kartri began its latest infringements, even under Kartri's self-serving position and illogical position that Kartri did not begin infringement until the date of the Hang2it product.

97.     And, in any event, all statements below regarding Plaintiffs' rights when Kartri began its infringement hold true whether taken from the date of Kartri's introduction of its Ezy-Hang products or its Hang2it products.

98.     The Hang2it products were introduced in or before January 2020.

99.     To be sure, Kartri represented to this Court that began selling its "tear drop" Hang2it products after July 17, 2020.  *See, Kartri I*, Dkt. 341 at 2.

100.    But that was a deliberate misrepresentation to this Court.

101.    Kartri started selling those products no later than January 2020 (*id.*, Dkt. 530 at 12 citing Dkt. 519 at 2 n.1, and Dkt. 519-4).  This is shown by Kartri's Facebook page, which illustrates Kartri promoting sales of those products at a trade show.

102.    Plaintiffs are entitled to recover damages for Kartri's violation of Plaintiffs' Trade Dress rights by Kartri's pre-injunction and post-injunction sales of the accused products.

103.    Kartri's sales of those products is an infringement of Plaintiffs' Trade Dress rights, as further set forth below.

<u>*Plaintiffs' Trade Dress is Set Forth With Specificity*</u>

104.    In *Kartri I*, Kartri had a full and fair opportunity to litigate the question of whether Plaintiffs' Trade Dress is set forth with sufficient specificity.

105.    This Court adjudicated in *Kartri I* that Plaintiffs' Trade Dress definition recites in specific detail the characteristics of the Trade Dress in a manner which is sufficiently precise to meet the requirements of law.

106.    Kartri is bound by that adjudication.

<u>*Plaintiffs' Trade Dress is Legally Non-Functional*</u>

107.    In *Kartri I*, Kartri had a full and fair opportunity to litigate the question of whether Plaintiffs' Trade Dress is legally functional or non-functional.

108.    As this Court adjudicated, Plaintiffs' Trade Dress is legally non-functional.  *Kartri I,* Dkt. 501 at 14, and at 61-62.

109.    Kartri is bound by that adjudication.

110.    Plaintiffs' Trade Dress is not essential to the use or purpose of a shower curtain.

111.    Plaintiffs' Trade Dress is not dictated by the functions to be performed by the article.

112.    Plaintiffs' Trade Dress does not affect the cost or quality of the device.

113.    Plaintiffs' Trade Dress does not put competitors at a significant non-reputation-related disadvantage.

114.    Plaintiffs' Trade Dress is not necessary to compete in the shower curtain market.

115.    For example, in *Kartri I*, Plaintiffs provided numerous examples of product designs not falling within Plaintiffs' Trade Dress.

116.    Some examples of non-infringing designs are illustrated and/or discussed in the Court's Opinion and Order.  *See,* Exhibit 4, Dkt. 501 at 10-11.

117.    Those non-infringing designs (among others made of record in *Kartri I*), can perform the functions of a shower curtain as well as Plaintiffs' Trade Dress; can be made with the same cost or quality as Plaintiffs' Trade Dress; and show that Kartri is not at a significant non-reputation related disadvantage.

118.    They each demonstrate that Plaintiffs' Trade Dress is non-functional.

119.    However, Kartri has refused to use any of the non-infringing designs.

120.    Kartri prefers to use the accused designs, to trade off of Plaintiffs' brand recognition, and to try to poach Plaintiffs' customers.

121.    The Patent Office has issued numerous design patents to Plaintiffs, and to others, further confirming the non-functionality of Plaintiffs' Trade Dress.  This is shown by its issuance of design patents to Plaintiffs' products, and to accused infringements, which fall under Plaintiffs' Trade Dress.

122.    A design patent may only be granted for an ornamental, i.e. non-functional, design.  *See e.g.,* 35 U.S.C. §171.

123.    Kartri applied for design patents on both accused products, which were representations to the Patent Office that the accused designs are ornamental, not functional.  *See,* Exhibits 5 and 6.

124.    Kartri is bound by those representations.

125.     Kartri was also granted design patents on both accused designs.  *See,* Exhibit 5, U.S. Design Patent No. D823,097 S1; and Exhibit 6, U.S. Design Patent No. D859,964 S1.

126.     Those design patents constitute findings by the Patent Office that the accused designs are ornamental, i.e., non-functional.

127.     Kartri's design patents, however, do not provide Kartri with the right to make or use the accused designs, because Plaintiffs have prior rights.

128.     In addition, Plaintiffs have received numerous design patents for Plaintiffs' designs.

129.     Some examples of Plaintiffs' design patents are attached.  *See*, Exhibit 7 (U.S. Design Patent No. D668,091); Exhibit 8 (U.S. Design Patent No. D669,721); and Exhibit 9 (U.S. Design Patent No. D937,607).

130.     Each of those designs falls within Plaintiffs' Trade Dress.

131.     Those design patents constitute findings by the Patent Office which further evidence that Plaintiffs' Trade Dress is ornamental, i.e., non-functional.

### *Plaintiffs' Trade Dress Has Secondary Meaning*

132.     In *Kartri I*, Kartri had a full and fair opportunity to litigate the question of whether Plaintiffs' Trade Dress has secondary meaning.

133.     As this Court adjudicated, Plaintiffs' Trade Dress has secondary meaning, also known as acquired distinctiveness.

134.     Kartri is bound by that adjudication.

135.     In fact, Kartri admitted the secondary meaning of Plaintiffs' Trade Dress.

136. In *Kartri I,* Kartri's co-owner testified that the marketing of Plaintiffs' products has done "really well" such that they are famous in hospitality; that buyers refer to them; and that 50% of them ask for them. *Kartri I,* Dkt. 243-29, Kubus Deposition at 52:7 – 53:15.

137. Likewise, Kartri's expert explicitly admitted that Plaintiffs' Trade Dress is well known in the hospitality market. *Id.*, Dkt. 243-25 at ¶¶32-33.

138. When Kartri's infringement began, Plaintiffs' Trade Dress had acquired distinctiveness as the source of the goods, and it is therefore entitled to protection.

139. In the minds of the public, and especially in the hospitality industry -- where Kartri is accused of infringing – the primary significance of Plaintiffs' Trade Dress was and is to identify the source of the product rather than the product itself.

140. Six non-exclusive factors are considered in this Circuit in determining whether a Trade Dress has acquired secondary meaning; namely, (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use.  Exhibit 4 at 69.

141. As to factor 1, Plaintiffs have engaged in extensive expenditures on advertising promoting the Trade Dress, as adjudicated by the Court in *Kartri I.*  Exhibit 4 at 69-71.

142. Plaintiffs' expenditures have continued to the present.

143. As to factor 2, the Court found that the evidence showed that a high percentage of buyers have asked Kartri for Plaintiffs' products, evincing a high degree of brand awareness which indicates secondary meaning.  Exhibit 4 at 72-73.

144.   That brand awareness has continued over the years to the present.

145.   For example, a survey conducted by Plaintiffs in March 2021 revealed unaided brand awareness of 25% of the Hookless® brand; and, as to aided brand awareness, that 58% of consumers associate Plaintiffs' products with the name Hookless®.

146.   That brand awareness is even higher in the hospitality field.

147.   As to factor 3, there has been unsolicited media coverage of the Trade Dress.  Exhibit 4 at 73-74.

148.   As the Court found, this includes coverage by QVC, *New York Magazine*, the American Society of Interior Designers, and *Woman's Day* magazine.  *Id.*

149.   In addition, further unsolicited coverage has continued.

150.   For example, in January 2020, the New York Times lauded Plaintiffs' waffle fabric shower curtain embodying Plaintiffs' Trade Dress.

151.   As to factor 4, Plaintiffs have had extensive sales success with their products sold under their Trade Dress.  Exhibit 4 at 74-75.

152.   Plaintiffs' sales success has continued to date.

153.   As to factor 5, attempts to plagiarize the Trade Dress, third parties have repeatedly attempted to copy and commercialize Plaintiffs' intellectual property.  Exhibit 4 at 75-78.

154.   As the Court found, Plaintiffs have policed their mark by sending cease and desist letters, or filing complaints, which have resulted in agreements to desist.  *Id.*

155.   Plaintiffs have continued that policing to the present date.

156.     As to factor 6, as the Court found, Plaintiffs have had long exclusivity of their Trade Dress.  *Id.* at 78-79.

157.     Since then, Plaintiffs have continued to police the mark to enforce their rights.

158.     Although some additional infringers have come into the market, particularly within approximately the last two years and encouraged by Kartri's open and notorious infringement, Plaintiffs have continued their enforcement efforts.

159.     In addition, such infringement has been in the retail market.

160.     For example, Plaintiffs filed an action in this Court on March 12, 2021 to stop the main infringer in retail, which had come to its attention on February 12, 2021. *See, Sure Fit Home Products, LLC et al. v. Maytex Mills, Inc.,* SDNY Civil Action No. 21-cv-2169.

161.     Likewise, Plaintiffs continue to enforce their rights against the smaller infringers, including recent knockoffs from China.

162.     In summary, the evidence produced in *Kartri I*, and as further set forth above, abundantly proves that Plaintiffs' Trade Dress has secondary meaning.

<u>*Plaintiffs' Trade Dress is Not Generic*</u>

163.     In *Kartri I*, Kartri had a full and fair opportunity to litigate the question of whether Plaintiffs' Trade Dress is or is not generic.

164.     As this Court adjudicated, Plaintiffs' Trade Dress is not generic.  *See,* Exhibit 4.

165.     Kartri is bound by that adjudication.

166.     As the Court held, Plaintiffs' Trade Dress is not generic:  (1) because it is

described with sufficient specificity; and (2) because it is narrow enough to permit competing commercial products and not confer a monopoly on Plaintiffs; and (3) because the Trade Dress is non-functional. *See,* Exhibit 4 at 63-66.

167.    Plaintiffs' Trade Dress was not generic before Kartri began to infringe or afterwards.

168.    Before Kartri began to infringe, Plaintiffs successfully enforced their rights against numerous infringers, providing exclusivity in Plaintiffs' designs.

169.    Likewise, after Kartri began to infringe, Plaintiffs have successfully enforced their rights against other infringers; and Plaintiffs continue to successfully enforce their rights; providing exclusivity in their designs.

170.    Plaintiffs have sent out cease and desist letters; filed a lawsuit against a major infringer; have engaged in communications to deter infringement; and have otherwise engaged in efforts to enforce their Intellectual Property Rights

171.    Plaintiffs have enforced their rights in the hospitality field, as set forth by the Court's adjudications in the *Kartri I* action.

172.    Plaintiffs have also enforced their rights in the retail industry.

173.    In some cases, it is Plaintiffs' understanding that parties have reserved their rights pending the outcome of litigation, such as the litigation in *Kartri I*.

174.    When Plaintiffs were aware of such positions, Plaintiffs have followed up after the Opinion and Order in *Kartri I* with communications to those infringers, such as cease and desist letters from counsel and/or direct communications from Plaintiffs, to notify third parties of the Court's Opinion and Order and Plaintiffs' rights.

175.    Plaintiffs Trade Dress is based on the total impression that it gives to the observer.

176.    When Plaintiffs introduced their Trade Dress in 1997, that total impression was of a new and novel product.  It was not an "industry custom."

177.    Likewise, when Kartri began to infringe, Plaintiffs' Trade Dress was not an industry custom in the hospitality industry.

178.    It is still not an industry custom in the hospitality industry.

179.    Nor was it, or is it, an industry custom in the retail industry.

180.    Rather, Plaintiffs commercialized their Trade Dress to great commercial success and brand awareness.

181.    For example, the number one shower curtains in the hospitality industry are curtains sold embodying Plaintiffs' Trade Dress, which are widely recognized as being Plaintiffs' curtains (also referred to as Hookless® curtains).

182.    As noted above, a survey conducted by Plaintiffs in March 2021 revealed unaided brand awareness of 25% of the Hookless® brand.  In addition, it revealed aided brand awareness such that 58% of consumers associate Plaintiffs' products with the name Hookless®.

183.    That brand awareness is even higher in the hospitality field.

184.    Plaintiffs Trade Dress was commercialized to success by their efforts, and is not in the public domain.

185.    Since before Kartri began to infringe through the present date, Plaintiffs have reserved the right, and continue to reserve the right, to pursue any infringers in

addition to Kartri, and have continued their efforts to enforce Plaintiffs' rights against any and all infringers.

186.    Since Kartri began to infringe through the present date, Plaintiffs have continued to successfully enforce their rights, with various parties having recognized and agreed to respect Plaintiffs' rights, and having agreed to desist from infringement of the Trade Dress, or to take a license from Plaintiffs.

187.    Since Kartri began to infringe through the present date, Plaintiffs have continued to use their Trade Dress, and have continued to police the market and assert their Intellectual Property Rights against other infringers.

*Plaintiffs' Trade Dress is Valid and Enforceable*

188.    Overall, Kartri had a full and fair opportunity in *Kartri I* to litigate the question of whether Plaintiffs' Trade Dress is or is not valid and enforceable.

189.    The Court ruled that Plaintiffs' Trade Dress is valid and enforceable.

190.    The Court's rulings in *Kartri I*, including the bases therefor, and the evidence in support, are set forth in the docket entries of *Kartri I*, and are incorporated herein by reference.

191.    Those rulings are all legally binding on Kartri in this case.

192.    As such, Plaintiffs' Trade Dress is legally valid, and is enforceable against Kartri here.

193.    As the Court previously determined, Plaintiff ZDG and its licensees owned valid and enforceable Trade Dress rights when Kartri began to infringe.

194.    Plaintiffs continue to own valid and enforceable Trade Dress rights.

24

*Kartri's Accused Products Pose a Likelihood of Confusion*

195.    Plaintiffs have created their designs, including their Trade Dress, and have extensively marketed, promoted, and sold their products, including their associated trademarks and Trade Dress, through extensive time, labor, skill, and money.

196.    As a result thereof, Plaintiffs' products have been extensively sold throughout the United States, and have become an extremely popular shower curtain design, including, the leading shower curtain in the hospitality market.

197.    Plaintiffs' trademarks, Trade Dress, and associated intellectual property and goodwill directed to its shower curtain products, are valuable assets of Plaintiffs.

198.    Under the *Polaroid* factors, Kartri's accused products pose a likelihood of confusion, infringing Plaintiffs' rights.

199.    With respect to the first *Polaroid* factor, Plaintiffs' Trade Dress rights are strong, as the Court previously held in *Kartri I*.  Exhibit 4 at 79.

200.    This weighs in favor of likelihood of confusion.

201.    With respect to the second *Polaroid* factor, Kartri's accused products are very similar to Plaintiffs' Trade Dress and products.

202.    As shown in Exhibit 1, the Hang2it product falls directly within the scope of Plaintiffs' Trade Dress definition.

203.    In fact, Kartri moved from the prior infringements to an infringement even closer to Plaintiffs, in an attempt to even more closely imitate Plaintiffs' horizontal slit versions that Kartri itself admitted are famous in the shower curtain industry.  *See e.g., Kartri I,* PTX 547.001.

204.     Kartri's flat-topped version of "Hang2it", shown in Exhibit 2, likewise falls directly within the scope of Plaintiffs' Trade Dress definition.

205.     In fact, Kartri's flat-topped version is very similar to the products found infringing in *Kartri I*.

206.     This factor also weighs in favor of likelihood of confusion.

207.     With respect to the third *Polaroid* factor, there is competitive proximity.

208.     Plaintiffs sell their products extensively in hospitality, as does Kartri.

209.     This factor also weighs in favor of likelihood of confusion.

210.     With respect to the fourth *Polaroid* factor, bridging the gap, Plaintiffs sell extensively in the hospitality market, which is where Kartri sells its accused products, so there is no gap to bridge.

211.     Moreover, Plaintiffs also sell extensively in the retail market, which is closely linked to the hospitality market, as the Court found in *Kartri I.*

212.     This factor also weighs in favor of likelihood of confusion.

213.     With respect to the fifth *Polaroid* factor, actual confusion is not required for a showing of infringement.

214.     Moreover, Kartri's actions have repeatedly caused confusion in the past, and continue to cause confusion.

215.     This factor also weighs in favor of likelihood of confusion.

216.     With respect to the sixth *Polaroid* factor, Kartri has acted in extensive bad faith, and continues to act in bad faith.

217.     As the Court previously adjudicated, Kartri willfully infringed Plaintiffs' rights.  *See e.g.,* Exhibit 4 at 92.

218.    In addition, Kartri continues to willfully infringe Plaintiffs' rights.

219.    As also discussed below (in the section entitled "Willful Infringement") it is beyond peradventure that Kartri has been long-aware of Plaintiffs' products and rights. Kartri is nonetheless selling the accused products in a deliberate attempt to illegally capitalize on Plaintiffs' Trade Dress and years of investment in building brand recognition, in Kartri's blatant continuation of the willful infringement tried in *Kartri I*.

220.    Thus, this factor, Kartri's bad faith, also weighs in favor of likelihood of confusion.

221.    The seventh *Polaroid* factor is the quality of the Defendants' product.

222.    Kartri has a history of supplying a lower quality product, as adjudicated in *Kartri I.*  See, Exhibit 4 at 92 – 94.

223.    In the accused products, Kartri continues to offer lower quality products, creating a risk of jeopardizing Plaintiffs' reputation.

224.    This factor also weighs in favor of likelihood of confusion.

225.    The eighth *Polaroid* factor is consumer sophistication.

226.    As the Court previously adjudicated, the evidence regarding this market, including the nature of the buyers, and the inexpensive cost of a shower curtain, shows lower sophistication.  Exhibit 4 at 95-96.

227.    This factor also weighs in favor of likelihood of confusion.

228.    Kartri's actions create a likelihood of confusion among consumers and members of the public (including, for example, buyers, distributors, and end users), before, during, and after purchase (including, for example, initial interest confusion, and post-sales confusion).

229.    Kartri offers its products to consumers in numerous ways, including, but not limited to, presentations on its website, offerings at trade shows, direct contacts with distributors and hotels, and email communications.

230.    Kartri's offerings individually and collectively create a likelihood of confusion.

231.    Based on the factors discussed above, including the issues previously adjudicated in *Kartri I* (such as, the strong trademark rights that Plaintiffs have accrued from their extensive and extremely successful use of their Trade Dress in commerce, the lack of a gap between Plaintiffs' and Kartri's products, and the nature of the products and purchasers), along with the high degree of similarity of the accused products herein to Plaintiffs' Trade Dress and products, along with Kartri's bad faith in again copying Plaintiffs' Trade Dress and products, there is a likelihood of confusion between Plaintiffs' Trade Dress and Kartri's accused products.

232.    The factors above, and the nature of Kartri's activities, including its history of trying to create confusion, render it probable that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of Kartri's accused products because of its entrance into the marketplace.

233.    Kartri's sales of the accused products likewise constitute unfair competition under federal and New York law.

234.    Kartri's accused products were introduced with the intent of trading off of the goodwill, secondary meaning, and success that Plaintiffs had accrued in its Trade Dress and products, and in the marketplace.

235.    And Kartri's products do trade off of the goodwill, secondary meaning, and success that Plaintiffs had accrued in Plaintiffs' Trade Dress, products, and marketplace.

236.    Kartri's actions in making, using, promoting, offering for sale, and selling the accused products poses a likelihood of confusion with Plaintiffs' Trade Dress.  This includes a likelihood that Kartri's actions and products will confuse, cause mistake, and deceive customers and users into believing that Kartri's goods originate from, are sponsored by, or are approved by, Plaintiffs; and/or that Kartri is affiliated with, connected with, or associated with, Plaintiffs.

237.    Kartri's actions have directly damaged, and continue to damage, Plaintiffs' brand recognition and the goodwill that Plaintiffs have built up in the marketplace.

238.    Furthermore, Kartri must be held to a strict standard in view of its history of infringement.

### KARTRI'S BAD FAITH WILLFUL INFRINGEMENT

239.    Kartri is selling its accused products in egregious bad faith.

240.    Kartri's bad faith is shown for example, by the fact that:

(1)    Kartri was well aware of Plaintiffs' products, long before Kartri introduced its accused Ezy Hang products.

(2)    Kartri was also fully on notice of Plaintiffs' assertion of Trade Dress rights in connection with the *Kartri I* case.

(3)    Knowing of Plaintiffs' Trade Dress rights, Kartri intentionally introduced the accused products, which products were deliberately

designed by Kartri to copy or imitate Plaintiffs' Trade Dress.

(4)     Kartri long knew of Plaintiffs' "horizontal slit" product versions of Plaintiffs' Trade Dress even before the *Kartri I* case.

(5)     Kartri also admitted in *Kartri I* that Plaintiffs' "horizontal slit" products are famous in the hospitality industry.

(6)     As a result, Kartri introduced its accused "tear drop" Hang2it product to imitate Plaintiffs' "horizontal slit" products and to infringe even more closely herein than in *Kartri I*.

(7)     Kartri was served with notice of this Court's Opinion and Order of December 22, 2022 (Exhibit 4), ruling that Plaintiffs have valid and enforceable Trade Dress rights.  But Kartri disregarded that ruling and continued to sell its accused products, despite the fact that even a cursory analysis by Kartri or its counsel would show that the accused products fall within the scope of the Trade Dress adjudicated valid by the Court.

(8)     Upon information and belief, Kartri also failed to obtain any non-infringement opinion from its prior or current counsel as to its accused products, whether before or after the date of the Court's Opinion and Order.

(9)     On January 23, 2023, Plaintiffs sent Kartri a cease and desist letter placing Kartri on notice that its ongoing sales of the "tear drop" Hang2it product infringes Plaintiffs' Trade Dress rights, and falls

within the scope of the injunction entered by the Court.  *See*, Exhibit 3.

(10)    Nonetheless, Kartri refused to desist from sales of those Hang2it products.

(11)    Thereafter, Kartri's counsel was unable to provide Plaintiffs with any reason why the accused product did not fall within the scope of the Trade Dress.  But Kartri still refused to desist from sales of any Hang2it products.

(12)    On March 2, 2023 this Court issued an Order indicating that the accused products are properly brought in a new lawsuit (resulting in the filing of the present action).  *Kartri I,* Dkt. 529.  In that Order, the Court noted the "substantial showing that Focus has previewed with its claim that Kartri's marketing of its Hang2it infringes the Court's injunction."  *Id.* at 2-3.

(13)    Despite this, Kartri still refused to desist from sales of Hang2it products, flouting the Court's sage guidance, and continued to violate the injunction.

241.    Kartri's Hang2it "tear drop" products are currently being sold in commerce.

242.    Upon information and belief, Kartri's flat-topped "Hang2it" products were previously sold in commerce.

243.    Kartri's activities, including its manufacture, use, import, offer for sale and sales of those accused products, have been without license or authority of Plaintiffs.

244.    Those activities are infringements of Plaintiffs' Trade Dress rights.

245.    Kartri's infringing activities have been and are deliberate and willful.

246.    Kartri's infringing conduct is with full knowledge of the adjudication of the Court in the Opinion and Order in *Kartri I*, and the Court's rulings in *Kartri I* as to the scope, validity, and enforceability of Plaintiffs' Trade Dress rights, and the Court-ordered injunction.

247.    In both communications and court filings since the cease and desist letter of Exhibit 3, Kartri and its counsel have provided no rebuttal to the fact that its Hang2it product falls directly within the scope of Plaintiffs' Trade Dress rights adjudicated in *Kartri I. See e.g.,* Dkt. 521 at 2.

248.    Despite all of this, Kartri has brazenly continued its infringement.

249.    Kartri has proceeded with its sales of the accused products, and refuses to stop.

250.    Kartri has proceeded in reckless disregard of an objectively high risk that it is infringing Plaintiffs' trademark rights, and violating the Court-Ordered injunction.

251.    Kartri has engaged in willful blindness regarding Plaintiffs' Trade Dress rights, the Court's Opinion and Order, and regarding its accused products' infringement of Plaintiffs' Trade Dress rights and violation of the Court-Ordered injunction.

252.    Despite the rulings in *Kartri I*, Kartri has recklessly chosen to continue to make, use, offer for sale, sell, and/or import the accused products.

253.    In view of the past adjudications of infringement, including adjudications of patent, trademark, Trade Dress infringement and unfair competition, Kartri should have made, and should be making, an extra effort to avoid infringement.

254.     It was Kartri's duty to keep a safe distance from the line drawn by the Court's injunction in *Kartri I*.

255.     However, Kartri is deliberately not doing so.

256.     Instead, Kartri is making every effort to continue to invade Plaintiffs' Trade Dress rights, to imitate Plaintiffs' products, and to violate or ignore the Court-ordered injunction.

257.     Kartri is flouting this Court's prior injunction, and its prior adjudications, in egregious bad faith.

258.     Kartri is also trying to reargue settled issues that were adjudicated in the *Kartri I* action, also in bad faith.

259.     Kartri is also basing its defenses on pre-emption challenges such as *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964), willfully misciting legal authority to attempt to justify its wrongful actions, and willfully disregarding the fact that federal and state unfair competition provisions coexist with patent law.  They are different regimes serving different purposes.

260.     Moreover, Kartri is well aware that it had a full and fair opportunity to raise any such defenses in *Kartri I,* and that the Court already adjudicated the proper and allowable scope of Plaintiffs' unfair competition claims by law.

261.     Kartri is nonetheless ignoring the Court's adjudication in that matter.

262.     Kartri is also engaging in deliberate delay tactics, in an attempt to evade the effect of the Court's prior injunction and adjudications as long as possible, and to continue to cause Plaintiffs to unnecessarily incur further and excess fees.

263.    Kartri had the option of making any one of many alternative shower curtain products that do not infringe Plaintiffs' Trade Dress.

264.    Examples of non-infringing products, which were not exhaustive, were disclosed in *Kartri I*, including the Court's Opinion and Order (Exhibit 4).

265.    Nonetheless, Kartri deliberately made the accused products herein, and continues to sell the accused products, for the same reason it made the prior Ezy Hang infringements – to sell products like Plaintiffs' Trade Dress; to exploit Plaintiffs' extensive expenditures and efforts at building brand recognition; and to create source confusion in the marketplace.

266.    Kartri's actions constitute willful infringement, and qualify for enhanced damages under 35 U.S.C. §284.

267.    Kartri's actions also constitute civil contempt of Court.

268.    Kartri's bad faith activities have caused and will continue to cause a likelihood of deception and confusion in the marketplace among consumers, and of extensive damage to Plaintiffs and their business, goodwill, and reputation.

269.    Kartri has illegally profited, and is illegally profiting, from its infringements of Plaintiffs' rights and its bad faith actions.

270.    Kartri's actions have caused and are causing irreparable harm to Plaintiffs.

271.    Kartri's bad faith activities, its communications with third parties, its brazen continuation of its infringements, and its actions in openly and notoriously flouting Plaintiffs' rights, have also directly and indirectly emboldened other infringers, causing Plaintiffs to incur additional fees, expenses, and damages to enforce their rights

against those other infringers, and additional harm and damages, all due to Kartri's bad faith actions.

272.    Plaintiffs have been damaged by Kartri's activities and will continue to be damaged unless Kartri is restrained and enjoined by this Court.

273.    Plaintiffs have no adequate remedy at law.

274.    Plaintiffs have been damaged by Kartri's illegal actions in an amount to be determined by this Court, including recovery and relief for Plaintiffs' lost sales, lost profits, price erosion, and damage to Plaintiffs' reputation and goodwill, and/or a disgorgement of Kartri's revenues and profits.

## DAMAGES

275.    Plaintiffs are being irreparably harmed by Kartri's infringing activities, and have no adequate remedy at law.

276.    Plaintiffs have been extensively damaged by Kartri's infringement in an amount to be determined by this Court.

277.    Plaintiffs seek damages as a result of Kartri's infringement which include, but are not limited to:  Plaintiffs' lost sales, lost profits, price erosion, and damage to their reputation and goodwill; and/or disgorgement of Kartri's revenues and profits; from Kartri's sales of infringing products, associated parts thereof, and from convoyed sales.

278.    Plaintiffs request that this honorable Court assess enhanced damages against Kartri in the fullest amount permissible by law, including, but not limited to, treble damages under federal law, and punitive damages under New York law, in view of the willful, egregious, malicious, and extensive nature of Kartri's bad faith activities complained of herein, the significant damage to Plaintiffs set forth above, the numerous

violations, and the willful nature of the violations – *now brazenly repeated by Kartri for the second time*.

279.    Plaintiffs further request enforcement of the injunction previously entered by the Court against the Hang2it it product, to bar further infringing acts by Kartri under federal and/or New York law, absent which Kartri's willful violations complained of herein will all continue.

280.    Plaintiffs further request that Kartri be held in civil contempt for its bad faith violation of the injunction entered into by the Court in the *Kartri I* action.

## COUNT I
## KARTRI'S ONGOING VIOLATION
## OF THIS COURT'S INJUNCTION

281.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

282.    Under Fed. R. Civ. P. 65(d)(1), this Court's Opinion and Order issued an injunction setting forth:  (A) the reasons why it was issued; (B) stating its terms specifically; and (C) describing in reasonable detail (and not by referring to the complaint or other document) the acts restrained or required.  *See,* Exhibit 4.

283.    Under Fed. R. Civ. P. 65(d)(2), Kartri's attorneys were provided with actual notice of the Opinion and Order via its filing on the Court's ECF system and docket notices regarding the same.  Likewise, Kartri and its officers, agents, servants, and employees were provided with actual notice of the Opinion and Order, since they were provided with actual notice by their counsel, and since the Complaint in this action discussing the Opinion and Order was served on Kartri.

284.     As such, the Court-ordered injunction binds Kartri and its officers, agents, servants, employees, and attorneys.

285.     Kartri's accused products fall directly within the scope of the Trade Dress, and therefore, the Court-ordered injunction (as discussed above and in the exhibits hereto).

286.     Kartri, however, has refused to abide by the injunction since its issuance and continuing to date.

287.     Kartri is violating the injunction is in willful bad faith by selling its accused products, as discussed above.

288.     Accordingly, issuance of a Second Order of this Court is requested:

    (1)     Ordering Kartro to fully abide by the terms of the Court's injunction, including desisting from further manufacturing, seling, advertising, or in any way commercializing the accused products;

    (2)     Finding Kartri in civil contempt for its violation of the injunction;

    (3)     Penalizing Kartri with a monetary penalty of no less than $5,000 per day (or such amount as this court deems just and proper) for each day that Kartri has violated, and continues to violate, the injunction, up through the date of the Second Order;

    (4)     Penalizing Kartri with an enhanced penalty of no less no less than $10,000 per day (or such amount as this court deems just and proper) for each day that Kartri continues to violate the injunction after the date of the Second Order; and

(5)     Awarding Plaintiffs their reasonable legal fees and costs incurred

as a result of Kartri's willful violation of the injunction.

### COUNT II
### LANHAM ACT TRADEMARK INFRINGEMENT
### AND UNFAIR COMPETITION
### 15 U.S.C. §1125(a)

289.    Plaintiffs repeat and re-allege each and every allegation contained in the

preceding paragraphs, as if fully set forth herein.

290.    This claim arises under the Lanham Act, 15 U.S.C. §1051 et seq.

291.    This Court has jurisdiction over this claim pursuant to 28 U.S.C. §1331.

292.    Kartri is intentionally making, using, importing, promoting, offering for

sale, and selling accused shower curtain products which are confusingly similar to

Plaintiffs' Trade Dress, in a manner that is likely to cause confusion, or to cause mistake,

or to deceive as to the affiliation, connection, or association of Kartri with Plaintiffs, or as

to the origin, sponsorship, or approval of Kartri's goods by Plaintiffs.

293.    Kartri's activities set forth herein constitute unfair competition, false

designation of origin, and false description and representations, in violation of Section

43(a) of the Lanham Act, 15 U.S.C. §1125(a).

294.    Kartri's activities also constitute a violation of the Court-Ordered

injunction entered in the *Kartri I* case.

295.    Kartri's acts of infringement, and its violation of the Court Order, were

and are willful and deliberate.

296.    Kartri has profited from their illegal and bad faith activities.

297.    Plaintiffs have suffered, and continue to suffer, substantial damages as a

result of Kartri's bad faith activities, in an amount to be determined by this Court.

## COUNT III
## NEW YORK COMMON LAW OF UNFAIR COMPETITION

298.    Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

299.    This claim arises under the common law of the State of New York.  *See e.g., Luv n' care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 135 (S.D.N.Y. 2010).

300.    This Court has jurisdiction over this claim pursuant to 28 U.S.C. §1367.

301.    Plaintiffs have created their marks and designs, including their Trade Dress, and have extensively marketed, promoted, and sold their products, including their associated designs and Trade Dress, through extensive time, labor, skill, and money.

302.    Kartri has engaged in unfair competition under New York common law by Kartri's bad faith misappropriation of the labors and expenditures of Plaintiffs, which is likely to cause confusion or to deceive purchasers as to the origin of Kartri's goods.

303.    Kartri has misappropriated business value of Plaintiffs, and have misappropriated the results of Plaintiffs' labor and skill and the expenditures of Plaintiffs, by marketing and selling goods that are confusingly similar to the designs and marks of Plaintiffs' goods, including Plaintiffs' Trade Dress in those goods.

304.    Kartri has used Trade Dress that are confusingly similar to Plaintiffs' Trade Dress, for the same type of goods, and has done so in bad faith.

305.    Kartri has used those marks, designs, and Trade Dress, in competition with Plaintiffs, gaining an unfair advantage, because Kartri bore little or no burden of expense of Plaintiffs' creation, development, marketing, and promotion of those marks, designs, Trade Dress, and goods.

306.     Kartri has engaged in bad faith misappropriation of Plaintiffs' labors in Plaintiffs' creating, marketing, promoting, and selling of their products bearing their designs and Trade Dress, which misappropriation is likely to cause confusion, to deceive purchasers as to the origin of the goods, and to dilute the value of Plaintiffs' designs and Trade Dress and the value of Plaintiffs' products bearing the same.

307.     Kartri's bad faith activities are intended to copy or mimic the Trade Dress associated with Plaintiffs, and to copy and mimic the same.

308.     Kartri's actions have caused significant commercial damage to Plaintiffs.

309.     Kartri's activities also constitute a violation of the Court-Ordered injunction entered in the *Kartri I* case.

310.     Kartri's conduct is illegal and actionable under the common law of unfair competition of the State of New York.

311.     Plaintiffs have been extensively injured by Kartri's illegal actions, and are entitled to the fullest breadth of the remedies provided under New York law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court, upon final hearing of this matter, grant the following relief against Kartri:

A.     That Kartri be adjudged to have engaged in unfair competition and trademark infringement under Section 43 of the Lanham Act, 15 U.S.C. §1125;

B.     That Kartri be adjudged to have engaged in trademark infringement and unfair competition under the common law of the State of New York.

C.      That Kartri, its officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation with Kartri be preliminarily and permanently enjoined from offering for sale, selling or marketing merchandise that copies or imitates any of Plaintiffs' trademark rights, including, Plaintiffs' Trade Dress, be preliminarily and permanently enjoined from offering for sale, selling or marketing merchandise that tends in any way to deceive, mislead or confuse the public into believing that Kartri's merchandise in any way originates with, is sanctioned by, or is affiliated with Plaintiffs; and be preliminarily and permanently enjoined from engaging in any activities violating Plaintiffs' rights under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), and the common law of the State of New York;

D.      That each of Kartri, its officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation with Kartri be preliminarily and permanently enjoined from otherwise competing unfairly with Plaintiffs;

E.      That each of Kartri, its officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation with Kartri be preliminarily and permanently enjoined from engaging in any and all further deceptive and unfair business practices with respect to Plaintiffs;

F.      That each of Kartri, its officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation

with Kartri be preliminarily and permanently enjoined from engaging in further acts infringing Plaintiffs' rights under federal and/or N.Y. law;

G.      That each of Kartri, its officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation therewith be held in civil contempt for violating the Court-Ordered injunction in *Kartri I*;

H.      That Kartri be directed to promptly file with this Court and serve on Plaintiffs, a report in writing, under oath, setting forth in detail the manner and form in which the Kartri has complied with the injunction;

I.       That Kartri be required to deliver up for impoundment during the pendency of this action, and for destruction thereafter, all copies of the infringing materials in its possession or under its control and all materials, including molds and master models, used for making same;

J.       That Kartri be required to account for and pay over to Plaintiffs any and all revenues and profits derived by it and all damages sustained by Plaintiffs by reason of the acts complained of in this Complaint, including an assessment of interest on the damages so computed, and that the damages be trebled, pursuant to 15 U.S.C. §1117 and all further applicable federal and state law;

K.      That Kartri be required to account for and pay over to Plaintiffs such actual damages as Plaintiffs have sustained as a consequence of Kartri's infringement; that the damages relating to Trade Dress infringement be trebled pursuant to 15 U.S.C. §1117; and that any and all damages

likewise be enhanced to the maximum available under all applicable federal and New York law; and that Kartri be required to account for and pay to Plaintiffs all of Kartri's gains, revenues, profits and advantages attributable to or derived by Kartri's infringement;

L.    That each such award of damages be enhanced to the maximum available for each infringement in view of Kartri's willful infringement of Plaintiffs' rights;

M.    That Plaintiffs be awarded punitive or exemplary damages under New York law because of the egregious, malicious, and tortious conduct of Kartri complained of herein;

N.    That Plaintiffs recover the costs of this action including their expenses and reasonable attorneys' fees pursuant to 15 U.S.C. §1117 and all further applicable law, because of Kartri's continuing willful infringement in bad faith, and Kartri's violation of the Court-Ordered injunction in *Kartri I*, which make this an exceptional case warranting such award;

O.    That Plaintiffs be awarded pre- and post-judgment interest, and costs;

P.    That Plaintiffs obtain all further relief permitted under the laws of the United States and the State of New York; and,

Q.    That Plaintiffs obtain all such other and further relief as the Court may deem just and equitable.

Dated: April 20, 2023                  */s/ Morris E. Cohen*
                                      Morris E. Cohen (MC-4620)
                                      Lee A. Goldberg (LG-9423)
                                      Limor Wigder (LW-1986)
                                        GOLDBERG COHEN LLP
                                      1350 Avenue of the Americas, 3rd Floor

New York, New York 10019
(646) 380-2087 (phone - main)
(646) 380-2084 (phone - direct)
(646) 514-2123 (fax)
MCohen@GoldbergCohen.com
LGoldberg@GoldbergCohen.com
LWigder@GoldbergCohen.com

Donald L. Rhoads
Rhoads Legal Group PC
100 Park Avenue, Suite 1600
New York, NY 10017
(917) 297-9852 (phone)
drhoads@rhoadslegal.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2023, a true and correct copy of the foregoing was served via the Court's ECF system on counsel of record in this action.

Dated:  April 20, 2023                     */s/Morris E. Cohen*                     
                                           Morris E. Cohen